OPINION OF THE COURT
Wesley, J.
The issue in this CPLR article 78 proceeding is whether petitioner, Express Industries and Terminal Corp., entered into a binding contract with respondent, New York State Department of Transportation (DOT), for the lease of a pier on the West Side of Manhattan when Express executed a permit that DOT characterized as its “final determination” for the lease. Because the permit omitted material terms of the purported contract, and there is insufficient objective evidence that the parties reached agreement with respect to those terms, *587 we hold that there was not an offer which Express could accept to create a contract. We therefore reverse the order of the Appellate Division and reinstate Supreme Court’s dismissal of the petition.
Express first began leasing a portion of the pier in the mid 1970’s from the Port Authority of New York and New Jersey, the former owner. As part of the preparations for the now defunct Westway project, ownership of the pier was transferred to DOT in 1981; however, the transfer did not affect Express’ leasehold interest, which did not expire until December 31, 1996. In 1990, the area was designated part of the West Side waterfront project (see, L 1990, ch 190, § 382-a). In early 1996, as it became clear that the pier would not immediately be utilized in the waterfront project, DOT began exploring options for its continued use. To that end, DOT opened discussions with Express with regard to an extension of its lease. In April 1996, the parties began negotiations for Express to lease the entire pier, covering approximately one million square feet.
The record contains little of the extent and nature of those negotiations. However, it is clear that, as things dragged on into fall, and the December 1996 lease expiration date loomed, the parties had still not reached final agreement. In fact, the price to be paid for the leasehold was not discussed until a meeting on September 10, 1996. At that meeting, and in subsequent correspondence, the State proposed rent of $4 million per year, plus maintenance and security costs. On October 4, 1996 Express countered with a barebones proposal including a different graduated rent schedule over four years with two option years. There was no further correspondence between the parties until DOT’s letter of November 15, which included the purported offer central to this dispute.
The “permit” that DOT forwarded to Express contained terms for lease of the pier, including the rental payments and the space contemplated. It also denominated Express’ execution of the document an “acceptance.” Additionally, the cover letter DOT sent with the permit noted that “the terms and conditions as stated in the permit are the Department’s final determination” with respect to the lease of the entire pier. The letter also advised that, should Express fail to accept the “terms and conditions” of the permit, arrangements would have to be made to continue its prior partial occupation.
The permit contained three omissions. First, there was a space to indicate the date on which DOT received a security *588 deposit from Express. Second, the permit did not designate the date by which DOT would be allowed to exercise an option to redeem approximately 70,000 square feet of space for use as a recreation field in the center of the pier — an option that was a new aspect of the deal. Finally, the permit did not specify the amount of rent reduction in the event that DOT chose to exercise the option.
The permit was executed on November 21, 1996, almost immediately upon receipt with no attempt by Express to fill in the blank terms. However, it was not returned to DOT for a week. In the interim, the parties engaged in additional discussions concerning the security deposit and option provisions. When Express finally returned the permit to DOT, it was accompanied by a cover letter dated November 26, 1996, in which Express questioned both of these requirements. The letter referenced the ongoing discussions between Express Vice President Rickey Mandel and State representatives, and then expressed concern that Express would lose tenants if the State exercised its option, because the area was a crucial truck turnaround. The letter also characterized the security deposit as “unnecessary since the State DOT is paid in advance” and suggested that the funds might be better used to maintain the premises. Under the permit, maintenance of the pier was the responsibility of Express.
Approximately one week after Express returned the executed permit, DOT notified Express that it had received another offer for lease of the pier. DOT gave Express a day to make a higher offer. Express responded by fax the next day that it considered the executed permit to be a binding contract. DOT countered by fax disagreeing with Express’ position and reaffirming its intent to award the pier permit to another party (respondent, Pier 40 Operating, LLC) unless Express made a higher offer by 5:00 p.m. that day. Express then brought the instant CPLR article 78 proceeding, seeking a preliminary injunction against award of the permit to Pier 40 Operating and ultimately seeking to compel DOT to execute the permit for Express.
Supreme Court denied the application for a preliminary injunction, holding that Express had failed to demonstrate a likelihood of success on the merits, and ultimately granted the motions by the State and Pier 40 Operating to dismiss the petition. The court held that DOT and Express “did not reach a meeting of the minds on all essential terms of the Permit,” because they had left “certain important items open for further *589 negotiation.” The court concluded that both the security deposit and option items were “important,” “material” terms upon which the parties had failed to agree, and thus there was no binding contract. Concluding that the contract formation issue was dispositive, the court did not reach respondents’ contention that an article 78 proceeding was not an appropriate procedural mechanism to litigate the dispute.
The Appellate Division reversed, one Justice dissenting. The majority analyzed the controversy as simply a question of whether the execution and return of the permit by Express constituted an acceptance or a counteroffer. The court rejected respondents’ position that the items left blank in the permit, and Express’ cover letter objecting to those terms, established that there was no agreement.
The court concluded that Express had until December 31, 1996 to tender the security deposit and that Express’ reservations about the option were not “a contradiction of the terms of the permit.” (252 AD2d 376, 380.) With respect to the option date and rent reduction, the court held that this was “merely an ambiguity that * * * will present an issue of fact for resolution [at the time the option is exercised, if ever].” (Id.) The court also noted that article 78 relief was appropriate because, once the validity of the contract was established, DOT had no discretion to award the permit to another party, and thus it could appropriately be compelled to perform the ministerial action of executing the permit with Express. This Court granted the motions for leave to appeal of DOT and Pier 40 Operating, and we now reverse.
While the Appellate Division majority focused on whether the execution of the permit was an acceptance or counteroffer, we begin our analysis a step earlier. To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms (Martin Delicatessen v Schumacher, 52 NY2d 105, 109). This requirement assures that the judiciary can give teeth to the parties’ mutually agreed terms and conditions when one party seeks to uphold them against the other. Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract.
The first step then is to determine whether there is a sufficiently definite offer such that its unequivocal acceptance will *590 give rise to an enforceable contract (Martin Delicatessen v Schumacher, supra, 52 NY2d, at 109). As we emphasized in Martin Delicatessen, “definiteness as to material matters is of the very essence of contract law. Impenetrable vagueness and uncertainty will not do” (id.). Of course, not all terms of a contract need be fixed with absolute certainty; “at some point virtually every agreement can be said to have a degree of indefiniteness * * * While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be ‘pedantic or meticulous’ in interpreting contract expressions” (Cobble Hill Nursing Home v Henry & Warren Corp., 74 NY2d 475, 483).
The inquiry is twofold: do the blanks in the permit render those terms impenetrably vague and uncertain, and are the terms themselves material? We answer both questions in the affirmative.
The vagueness question is simple and straightforward. There is no way to tell from the face of the document how the parties intended to establish the date by which DOT could exercise the redemption option, and the amount of the rent reduction in the event that it did. Moreover, Express has pointed to nothing from which a court could objectively decipher the intended meaning of the blank spaces. That is not surprising; the option had not been a subject of negotiation between the parties prior to the date DOT forwarded the permit.
Express maintains that its execution of the agreement without these terms was indicative of its willingness to accept whatever terms DOT chose, limited only by DOT’s general duty of good faith and fair dealing. While there are some instances where a party may agree to be bound to a contract even where a material term is left open (see, e.g., UCC 2-305 [1] [“The parties if they so intend can conclude a contract for sale even though the price is not settled”]), there must be sufficient evidence that both parties intended that arrangement. Here, there is no objective evidence that the parties intended that DOT be allowed to fill in these blanks with any reasonable terms they chose.
Moreover, while the option provision involved only 7% of the over-all dock space, the 70,000 square feet in question was, according to Express itself, in the center of a truck turnaround that was crucial to the financial viability of the pier. Indeed, Express’ letter accompanying the signed permit emphasizes the materiality of the provision, noting that exercise of the op *591 tion would cause “loss of jobs and value of the Pier” and “would cause loss of tenants that require [the truck turnaround] in order to conduct their business.” Thus, the open-option terms effectively meant that the contractual terms defining the extent of the leased space and the amount to be paid for that space were left open. The fact that the option might never be exercised does not, as the Appellate Division held, render it immaterial. Here, the exercise of such a unilateral option was identified by Express as a deal breaker.
The proposed permit was not a sufficiently definite offer which could give rise to an enforceable agreement.* In light of this disposition, we need not consider whether Express’ “acceptance” was sufficiently definite (compare, 2 Williston, Contracts § 6:10, at 68 [Lord 4th ed] [“(a)n acceptance, in order to be effective, must be positive and unambiguous”]; Restatement [Second] of Contracts § 61, at 148 [“(a)n acceptance which requests a change or addition to the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms”]).
Accordingly, the order of the Appellate Division should be reversed, with costs, respondents’ motions to dismiss granted and the petition dismissed.
Chief Judge Kaye and Judges Smith, Ciparick and Rosenblatt concur; Judges Bellacosa and Levine taking no part.
Order reversed, etc.

 [2] Respondents also contend that a CPLR article 78 proceeding is not the proper vehicle for petitioner’s claims. This Court has held that, where a governmental entity has entered into a binding contract, mandamus will lie to compel the ministerial act of executing the agreement (see, Matter of Municipal Consultants & Publs. v Town of Ramapo, 47 NY2d 144). As the Appellate Division noted, petitioner’s claim for article 78 relief would fit within the narrow Ramapo holding if a contract had been created. Thus, the procedural mechanism was proper although its underlying premise for judicial relief falls short.